UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**CINDY L. OEHMIGEN,**

                                        Plaintiff,

        v.

**CENTRAL NEW YORK TECHNOLOGY
DEVELOPMENT ORGANIZATION, INC. and
SCOTT M. CURTIS,**

                                Defendants.
_____

**JURY DEMANDED
COMPLAINT**

Civil Action No.  5:17-cv-1099 (BKS/TWD)

Plaintiff Cindy L. Oehmigen ("Plaintiff" or "Ms. Oehmigen"), by and through her

attorneys, Bousquet Holstein PLLC, as and for her Complaint against Defendants, Central New

York Technology Development Organization, Inc. and Scott M. Curtis, alleges and states as

follows:

## THE PARTIES

1.      Cindy Oehmigen is a female resident of the State of New York, County of

Onondaga.

2.      Central New York Technology Development Organization, Inc. ("CNYTDO") is

a New York not-for-profit corporation. At all relevant times its headquarters were at 445

Electronics Parkway, Suite 206, Liverpool, New York 13088 in the County of Onondaga.

3.      CNYTDO is comprised of two separate and distinct business units.

4.      The first unit operating as part of the CNYTDO was, at all relevant times, the

Manufacturing Extension Partnership (MEP) Center, which operates in partnership with the

United States Department of Commerce National Institute of Standards and Technology (NIST)

and the Empire Statement Development Division of Science, Technology & Innovation (NYSTAR).

5.     The MEP Center is part of a network of 51 national MEP centers located within each state and in Puerto Rico.

6.     The mission of the MEP Center is to provide educational and operational support to manufacturing businesses in Cayuga, Cortland, Madison, Onondaga, and Oswego counties through grants from the U.S. Department of Commerce (via NIST) and the State of New York (via NYSTAR).

7.     The second unit is the Training Within Industry (TWI) Institute (the "Institute"), a fee-for-service program founded in 2009 as a part of the CNYTDO.

8.     The Institute delivers operational training to businesses throughout New York State, the United States and the world.  The activities of the Institute do not receive funding from the federal government or from the State of New York, or any other public support.

9.     Upon information and belief, Scott Curtis ("Curtis" or "Mr. Curtis") is an individual residing at 2716 Hiltonwood Road, Baldwinsville, NY 13027.  At all times relevant to this matter, Curtis resided within the State of New York. He was initially employed as the Director of the Institute. He is, and at all relevant times the Chief Executive Officer of CNYTDO and President of the Institute.

## JURISDICTION AND VENUE

10.     This is an action brought by Ms. Oehmigen against CNYTDO for retaliation pursuant to the Federal False Claims Act, 31 U.S.C.. § 3730 (h) and the New York State False Claims Act, N.Y. State Fin. Law § 191, violation of the New York Not-for-Profit Corporations

2

Law, N.Y. N-PCL § 714, breach of implied contract, and age and gender-based discrimination pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 296.

11.     Ms. Oehmigen also brings claims against Mr. Curtis individually for tortious interference with contract, defamation and as an aider and abetter of gender and age-based discrimination pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 296.

12.     The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves claims of retaliation under the False Claims Act, 31 U.S.C. § 3730(h).

13.     The Court has jurisdiction over Plaintiff's state law claims pursuant to the doctrine of pendant jurisdiction.

14.     Venue is also proper in the Northern District of New York, pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in the Northern District of New York.

## FACTUAL BACKGROUND

15.     CNYTDO hired Ms. Oehmigen in January of 2005 as a Senior Project Manager for the MEP Center.

16.     As a Senior Project Manager for TDO, Ms. Oehmigen provided strategic support to manufacturing businesses throughout the five counties of Central New York -- Cayuga, Cortland, Madison, Onondaga, and Oswego.   She led initiatives to develop business growth strategies and improve manufacturing competitiveness for manufacturing businesses through training, workforce development, and marketing, with the ultimate goal of creating and maintaining jobs within Central New York.

17.     During the initial years of her employment, Ms. Oehmigen reported directly to the former CEO and President of CNYTDO and MEP Center Director, Robert Trachtenberg.  Ms. Oehmigen and Mr. Trachtenberg shared a strong and productive working relationship.  Though she was not given performance reviews because of her senior position within CNYTDO, Ms. Oehmigen always received her annual performance bonus and was given positive feedback and praise on her work by Mr. Trachtenberg.

18.     In October of 2009, Mr. Trachtenberg informed Ms. Oehmigen that he was considering retirement, and that he had notified the CNYTDO Board of Directors (the "Board") that he had recommended to the Board that Ms. Oehmigen succeed him as CEO.

19.     From that point onwards, Mr. Trachtenberg began working with Ms. Oehmigen to "groom" her for the CEO position and to train her on the mechanics of running the CNYTDO organization, specifically, the operations of the MEP Center.  For example, in December of 2009, Mr. Trachtenberg submitted Ms. Oehmigen's name for participation in the NIST MEP Emerging Leaders Conference, which was designed for future leaders of MEP Centers nationally.  Ms. Oehmigen participated in the conference in order to prepare herself to succeed Mr. Trachtenberg within the organization.

20.     Around the same time period, Mr. Trachtenberg, in collaboration with Robert Wrona, a director for CNYTDO, founded the Institute.  A Certificate of Assumed Name ("d/b/a") was filed for the Institute in 2009.  The d/b/a allowed the Institute to operate under the assumed name of "TWI Institute" in the five counties of Central New York -- Cayuga, Cortland, Madison, Onondaga, and Oswego.

21.     Shortly after the Institute's founding, Mr. Wrona assumed the role of Executive Director of the Institute and hired Mr. Curtis as the Institute's Director.  Mr. Curtis reported

4

directly to Mr. Wrona, and Mr. Wrona put in place a succession plan under which Curtis would take over as Executive Director of the Institute upon Mr. Wrona's retirement.

22.     From 2009 until the spring of 2014, Mr. Trachtenberg continued to act in a combined role as CEO and President of CNYTDO and MEP Center Director, with Mr. Wrona acting as Executive Director of the Institute.

23.     Mr. Curtis' job duties, while reporting to Mr. Wrona, were limited to the management of the Institute.   He had only incidental and superficial knowledge of or involvement in the operations of the MEP Center.

### MR. CURTIS IS SELECTED AS CEO OF CNYTDO

24.     In the spring of 2014, Mr. Trachtenberg announced that he was retiring from CNYTDO in January of 2015.  The announcement led to a series of meetings and conversations within CNYTDO about the selection of Mr. Trachtenberg's successor.   By that time, Ms. Oehmigen had been promoted by Mr. Trachtenberg to the position of MEP Center Director.

25.     Shortly thereafter, Mr. Wrona also announced his retirement from his position as President of the Institute.

26.     In August of 2014, Mr. Trachtenberg approached Ms. Oehmigen and informed her that he would not be involved in the process to select his successor and that the decision would instead be left to CNYTDO's Executive Committee.  Mr. Trachtenberg also informed Ms. Oehmigen that, in addition to her application, the Board would consider Mr. Curtis, as well as outside candidates, for the position of CEO of CNYTDO.

27.     On September 9, 2014, as they were competing for the position of CEO, both Mr. Curtis and Ms. Oehmigen presented to the Executive Committee their respective approaches to managing CNYTDO.

28.     On September 17, 2014, the Executive Committee of CNYTDO met and selected Mr. Curtis as CEO of CNYTDO and Mr. Trachtenberg's successor.

29.     The Executive Committee also named Ms. Oehmigen as President of the MEP Center and Mr. Curtis as President of the Institute.  Under this arrangement, both Ms. Oehmigen and Mr. Curtis were given full responsibility and professional autonomy with respect to the operations of the MEP Center and the Institute, respectively.  However, as CEO of CNYTDO, Mr. Curtiss had ultimate financial oversight over CNYTDO.

30.     On the same day that the decision was made to name Mr. Curtis as CEO, Mr. Trachtenberg met with Ms. Oehmigen and informed her of the Executive Committee's decision. While explaining the decision to Ms. Oehmigen, Mr. Trachtenberg stated, "maybe it was because you are an older woman."

31.     Later on that day, Mr. Trachtenberg met with the staff of the MEP Center and informed them of the Executive Committee's decision.  The MEP Center staff expressed disappointment and confusion over the Executive Committee's decision to hire Mr. Curtis as CEO over Ms. Oehmigen.  In a later meeting, one staff member, Deb Forbey (who later resigned), stated that she (Deb Forbey) "went to bed working for TDO" and "woke up working for the Institute."

**MR. CURTIS ATTEMPTS TO EXCLUDE AND UNDERMINE MS. OEHMIGEN**

32.     After Mr. Curtis was selected to succeed Mr. Trachtenberg, Ms. Oehmigen nevertheless continued her diligent work on behalf of CNYTDO.  Ms. Oehmigen's strong performance brought positive results to the MEP Center and CNYTDO as a whole.

33.   Ms. Oehmigen exercised the utmost collegiality while working with her colleagues at CNYTDO, including Mr. Curtis.   Unfortunately, however, Mr. Curtis did not reciprocate Ms. Oehmigen's professionalism.

34.   Ms. Oehmigen was never informed that she was to report to Mr. Curtis or even consult with him regarding the operations of the MEP Center.  However, in the months and years that followed Mr. Curtis' promotion to CEO, he treated Ms. Oehmigen as his subordinate, interfered in her work on behalf of the MEP Center, and attempted to undermine her position as its President.

35.   On numerous occasions, Mr. Curtis excluded Ms. Oehmigen from meetings and conversations in which he and his male colleagues, including Robert Kocik, who was then CNYTDO's Human Resources Manager and Ms. Oehmigen's subordinate, participated.   Mr. Curtis was dismissive towards Ms. Oehmigen when she expressed concern about this exclusion, the wisdom of this decision and the authority Mr. Curtis had to take those actions.

36.   In March of 2015, Mr. Curtis interfered in the hiring process for an MEP Center employee who would report to Ms. Oehmigen, and attempted to force Ms. Oehmigen to hire the individual of his choice.  Ms. Oehmigen resisted Mr. Curtis' interference and told him to adhere to CNYTDO's standard hiring process.

37.   Beginning in the fall of 2015, Ms. Oehmigen informed Mr. Curtis, on numerous occasions, that CNYTDO may not be meeting its requirements for tax exemption under IRS Code Section 501(c)(3), due to the fact that state or federal grants or public support were not intended to support the activities of the Institute, but only the activities of the MEP Center.  Mr. Curtis ignored Ms. Oehmigen's concerns.

38.     In September of 2015, a request for proposal (RFP) process for Regional Technology Development Center (RTDC) funding opened.  Under the RTDC program, the MEP Center was to receive a grant of $575,000 per year for five years provided it met certain funding requirements.  Specifically, each MEP Center was to focus on an economic "cluster," or strategic initiative, determined by the Regional Economic Development Council (REDC).  The cluster assigned to the MEP Center was "Data to Decisions."  In order to receive its full RTDC funding, the MEP Center was expected to support this cluster by engaging in activities to advance data collection, access and analytics as it relates to manufacturing.

39.     Shortly after the RFP process began, Ms. Oehmigen contacted Robert Simpson, a co-chair of the REDC, to seek advice on steps that the MEP Center can implement to support the "Data to Decisions" cluster.  Mr. Simpson was and is the President of Centerstate Corporation for Economic Opportunity ("Centerstate CEO"), another regional economic development non-profit.  He is also a member of the CNYTDO Board.

40.     In November of 2015, two months into the RFP process for the RTDC funding, Mr. Simpson approached CNYTDO and offered on behalf of Centerstate CEO to collaborate on marketing initiatives with the MEP Center in exchange for $250,000 of the MEP Center's annual RTDC funding.  The MEP Center relied heavily on its receipt of all of RTDC funding, and a proposed collaboration with Centerstate and a resulting loss of funding would have forced the MEP Center to close.   Ms. Oehmigen therefore advised the Board not to agree to the collaboration and to instead move forward with a proposal to obtain all of the RTDC funding. Based on Ms. Oehmigen's recommendation, the Board decided that the MEP Center would proceed with its proposal as planned, without any collaboration with Centerstate CEO.

41.     Shortly after the Board's decision, and without Ms. Oehmigen's knowledge or input, Mr. Curtis sent an email to Mr. Simpson and initiated a further conversation regarding collaboration between the MEP Center and Centerstate CEO.  Specifically, Mr. Curtis told Mr. Simpson that, if Centerstate CEO were awarded the RTDC funding, the MEP Center would agree to act as a subcontractor to its projects to deliver required resources.   Mr. Curtis' actions undermined Ms. Oehmigen's standing both within CNYTDO and within the Central New York non-profit business community at large.  It also endangered the continued existence of the MEP Center.

42.     At Ms. Oehmigen's insistence, Mr. Curtis rescinded the offer that he made to Mr. Simpson so that the MEP Center could compete for and receive all of the RTDC funding. Ultimately, through Ms. Oehmigen's conscientious efforts and without any assistance from Mr. Curtis, the MEP Center prepared a successful proposal and was awarded all of the RTDC funding, as well as an additional $65,000 by pursuing other available funds.  Due to Ms. Oehmigen's work, the MEP Center was able to maintain its operations.

## MS. OEHMIGEN EXPRESSES CONCERNS ABOUT CNYTDO'S GOVERNANCE DOCUMENTS

43.     In November of 2015, Ms. Oehmigen began preparing documentation for grant applications submitted through the State's GrantGateway, an online repository for non-profits to store and submit commonly requested documents, including corporate governance documents, for their grant applications.

44.     As Ms. Oehmigen was uploading CNYTDO's corporate governance documents, which are required for almost all State grant applications, she became concerned that the geographic and substantive scope of CNYTDO's operations exceeded those authorized by its Certificate of Incorporation (the "Certificate").  Specifically, she noticed that the Certificate

incorrectly represented that CNYTDO was principally doing business in five (5) counties within New York State and in and around Central New York, even though the Institute performed business throughout New York State, as well as nationally and internationally.  She also noticed that the Certificate did not accurately reflect the substantive scope of the organization's operations.

45.     Ms. Oehmigen also became concerned that CNYTDO had not filed the requisite name certificates to permit the organization to do business under the Institute's name outside of the five counties listed on the Institute's dba filings, and that necessary updates to CNYTDO governance documents and policies, including CNYTDO's conflict of interest policy, may not have been made to comply with the New York Nonprofit Revitalization Act (NYNPRA).  Ms. Oehmigen became concerned that these deficiencies may have caused CNYTDO to be out of compliance with its contracts with grant providers.

46.     Out of concern for the well-being of CNYTDO, Ms. Oehmigen immediately brought these issues to the attention of Mr. Curtis.  She reached out to him at least four (4) times regarding the importance of filing a corrected Certificate with the State and correcting CNYTDO's other corporate governance documents.   Mr. Curtis ignored Ms. Oehmigen's concerns, declined to address the situation and dismissively disregarded Ms. Oehmigen.

47.     After attempting for two months to discuss her concerns about the Certificate with Mr. Curtis, Ms. Oehmigen brought her concerns to Gina Lee-Glauser, the Chair of the Board. Ms. Lee-Glauser initially refused to meet with Ms. Oehmigen to discuss the corporate governance documents.  Then, after several weeks and an additional attempt by Ms. Oehmigen to raise the issue, Ms. Lee-Glauser sent Ms. Oehmigen an email on March 2, 2016, which stated,

"I appreciate our conversation and concern for compliance.  I want to let you know that the Certificate of Incorporation was amended in 2009 to include the TWI activities."

48.     Ms. Lee-Glauser's email to Ms. Oehmigen was insufficient and problematic for two reasons.  First, it failed to address Ms. Oehmigen's concerns regarding the d/b/a for the Institute and the required updates to CNYTDO's policies that were needed to comply with the NYNPRA.  Second, and most importantly, a review of the New York State Secretary of State's website did not show the amendment which Ms. Lee-Glauser referred to.  Thus, CNYTDO was operating outside the scope authorized by its 1988 and 2006 corporate filings and, apparently, Ms. Lee-Glauser had been given incorrect information.

49.     Shortly after she received Ms. Lee-Glauser's email on March 2, 2016, Ms. Oehmigen responded by stating, "Really? Where do I find that.  That is huge and provides significant relief."

50.     Ms. Lee-Glauser's response stated, simply, "Bob assured us we do."

51.     Shortly after she received Ms. Lee-Glauser's email, Ms. Oehmigen searched, in vain, for a signed and submitted 2009 amendment to the Certificate.  When she was not able to find any such document and having been rebuffed by both Ms. Lee-Glauser and Mr. Curtis, Ms. Oehmigen contacted Stephen Bregande, another member of the Board, to seek his advice and to alert him of her concerns regarding CNYTDO's governance documents.  In her email to Mr. Bregande, Ms. Oehmigen raised a concern that CNYTDO, specifically the MEP Center, may be audited by the Office of the New York State Comptroller and lose its state funding.

52.     In the absence of an adequate response from Mr. Curtis and the Executive Committee and fearing that CNYTDO was operating outside the scope authorized by its corporate filings, Ms. Oehmigen contacted and retained her own counsel to investigate

CNYTDO's compliance.  Ms. Oehmigen's attorney, Phillip Zaccheo, Esq. of Bond, Schoeneck & King, PLLC, reviewed CNYTDO's corporate governance documents and confirmed that they were deficient.

53.     Mr. Zaccheo then contacted CNYTDO's attorney, Timothy Frateschi, Esq. of the Frateschi Law Firm, to discuss the deficiencies in detail.   At the close of Mr. Zaccheo's conversation with Mr. Frateschi, Mr. Frateschi agreed to file amendments to remedy some, but not all, of the deficiencies found by Mr. Zaccheo.

### CNYTDO MISUSES MEP CENTER RESOURCES TO THE INSTITUTE

54.     During the same time period in which Ms. Oehmigen was attempting to remedy CNYTDO's corporate compliance issues, she became concerned about another serious issue: Mr. Curtis was using the MEP Center's resources to support the Institute in a manner that appeared to artificially enhance the Institute's financial performance while impacting the performance of the MEP Center.  Specifically, Mr. Curtis was utilizing employees of the MEP Center, whose positions were funded by federal and state grants, to perform fee-for-service work which benefitted the activities of the Institute rather than the MEP Center.   Given that the Institute operated nationally and internationally, this misuse included, but was not limited to, sending MEP Center employees on business trips outside of New York State, where they were inaccessible to support the MEP Center's activities and could not perform any of their federal and state-funded job duties.

55.     Upon information and belief, Mr. Curtis' actions in enriching the Institute at the expense of the MEP Center constituted a conversion of federal and state funds that were intended for the provision of services and goods under federal and state government programs.  These

actions had the effect of promoting, assisting and making more competitive businesses outside of the United States.

56.     Upon information and belief, Mr. Curtis' actions also resulted in inaccurate and improper accounting by CNYTDO, which may have resulted in the reporting of false information to the federal and New York State governments.

57.     In an effort to stop the misuse of federal and state resources which were intended for the MEP Center, Ms. Oehmigen confronted Mr. Curtis about his practices and advised him that CNYTDO was under an obligation to comply with the terms of its receipt of government money.  Mr. Curtis responded with overt hostility and refused to stop diverting resources from the MEP Center.   At one point, Mr. Curtis stated, "$8000 isn't going to make or break your budget."

58.     Unable to communicate with Mr. Curtis, Ms. Oehmigen reached out to her former boss and mentor, Mr. Trachtenberg, who served on the Board's Executive Committee, to voice her concerns.  Upon information and belief, Mr. Trachtenberg relayed Ms. Oehmigen's concerns to the Executive Committee.

59.     On March 22, 2016, the Board's Executive Committee met with Ms. Oehmigen. Rather than acknowledging and addressing Ms. Oehmigen's concerns, members of the Executive Committee admonished Ms. Oehmigen for questioning Mr. Curtis.   Some members of the Executive Committee, apparently speaking for the entire Committee, told her that she reported to Mr. Curtis and was expected to follow his supervision.

60.     Following the meeting, Mr. Curtis approached Ms. Oehmigen.  He told her that the Executive Committee had instructed him to meet with her to make amends.  During her conversation with Mr. Curtis, Ms. Oehmigen commented that she did not know why their

relationship had deteriorated.  Mr. Curtis responded by stating that he "believed you were undermining me, and you need to know that I can be as nasty as the best of them."  Ms. Oehmigen then responded, "So can I, but I choose not to."

### MR. CURTIS CONTINUES TO USE MEP CENTER RESOURCES

61.     In the months following the March 2016 Executive Committee meeting, Ms. Oehmigen continued to devote her time and attention to the work of the MEP Center. Meanwhile, Mr. Curtis continued his practice of excluding Ms. Oehmigen from meetings attended by her male colleagues and attempting to undermine her position as President of the MEP Center.

62.     During the Board's September 2016 meeting, Ms. Oehmigen prepared and presented a recap of the MEP Center's 2016 financial performance.  During her presentation, Ms. Oehmigen informed the Board that the MEP Center was behind in its 2016 financial projections by about $80,000.  This deficit was caused, at least in part, by Mr. Curtis' actions in diverting staffing and other government-funded resources from the MEP Center to the Institute.

63.     Nonetheless, the deficit was nothing unusual, and the Board voted during the September 2016 meeting to award Ms. Oehmigen her full performance bonus for 2016, just as it had awarded Mr. Trachtenberg bonuses in the past despite similar deficits.

64.     Both before and after the September 2016 Board meeting, Ms. Oehmigen continued to stress the importance tracking the allocation of staffing and other resources between the activities of the MEP Center and the Institute.  In particular, Ms. Oehmigen requested two CNYTDO staff members who were assigned to the MEP Center, Clara Scherfner and Susan Kuhns, to document any time that they spent working for the Institute.  Ms. Oehmigen reiterated to her staff and to the Board that NYSTAR, the MEP Center's grant making entity, had begun

auditing MEP centers throughout the state and that the continued existence of the MEP Center depended on conservation of its resources.

## CNYTDO FORCES MS. OEHMIGEN TO SIGN A LETTER OF UNDERSTANDING

65.    On or about October 19, 2016, Ms. Oehmigen was summoned to Mr. Curtis' office by Mr. Kocik.  Mr. Curtis and Mr. Kocik presented Ms. Oehmigen with a "Letter of Understanding," pursuant to which Ms. Oehmigen was to certify that CNYTDO "is fully compliant to the best of [her] knowledge under the state and federal laws and regulations" and is "operating legally, ethically and fully compliant."

66.    Upon presenting the Letter of Understanding to Ms. Oehmigen, both Mr. Curtis and Mr. Kocik made clear that Ms. Oehmigen was to sign the document as a condition of her continued employment with CNYTDO.  Ms. Oehmigen asked if she could have the weekend to consider the ramifications of signing the Letter of Understanding, as she continued to have concerns regarding the legitimacy of CNYTDO's operations.

67.    Mr. Curtis initially indicated that Ms. Oehmigen could take additional time to consider the document.  However, on or about October 21, 2016, Mr. Curtis informed Ms. Oehmigen that the Chair of the CNYTDO Board had directed that she must sign immediately.

68.    Under the threat of losing her job, Ms. Oehmigen signed the Letter of Understanding.

## CNYTDO UNLAWFULLY TERMINATES MS. OEHMIGEN

69.    On January 3, 2017, Ms. Oehmigen was summoned to Mr. Curtis' office and informed by Mr. Curtis and Mr. Kocik that her employment with CNYTDO was terminated effective immediately for "performance reasons."  When Ms. Oehmigen requested additional clarification on what "performance reasons" led to her termination, Mr. Curtis accused her of

"misleading" the Executive Committee of the Board in her September 19, 2016 presentation of the MEP Center's finances.

70.     Upon information and belief, the CNYTDO Board was not informed of Ms. Oehmigen's termination until January 6, 2017, when Ms. Lee-Glauser sent a letter to the Board stating that Ms. Oehmigen was terminated from employment with CNYTDO.   In Ms. Lee-Glauser's January 6, 2017 letter to the Board, she stated that Ms. Oehmigen's termination "was supported by the Executive Committee."   Ms. Lee-Glauser went on to state that the Board was not required to vote on Ms. Oehmigen's removal because she "was not and has never been an officer of the Corporation."

71.     Near the close of the letter, Ms. Lee-Glauser presented the following purported reason for Mr. Oehmigen's termination:   "Cindy's position is funded by the NYSTAR MEP contract and dictated by its terms and conditions.   Scott received input from the NY State sponsor of serious performance issues and worked closely with them in his decision which the Executive Committee fully supported."

72.     The purported reason for Ms. Oehmigen's termination found within Ms. Lee-Glauser's January 6, 2017 letter is inconsistent with the reason given by Mr. Curtis on January 3, 2017 and is false.

73.     Upon information and belief, the "NY State sponsor" referenced within Ms. Lee-Glauser's letter is Matthew Watson, Director of NYSTAR, which is the MEP Center's grant making entity.   Upon information and belief, Mr. Curtis had no relationship or contact with Mr. Watson until just prior to Ms. Oehmigen's termination, as Mr. Curtis had no role in the day-to-day operations of the MEP Center.   Therefore, Mr. Curtis would have no opportunity to receive "input" from Mr. Watson regarding Ms. Oehmigen's job performance.   Furthermore, it would be

highly uncharacteristic for any state official to provide feedback on a state-funded employee's job performance and/or direct that such an employee be terminated.

74.    It is clear that the purported "performance" issues put forth by CNYTDO were merely a pretext.  Ms. Oehmigen was terminated in retaliation for her diligence in questioning CNYTDO's corporate compliance matters and its use of false information to grant making entities, as well as her attempts to stop Mr. Curtis from diverting state and federal funds earmarked for the MEP Center to the Institute.

75.    It is also Ms. Oehmigen's belief that Mr. Curtis, Mr. Kocik and others acting on CNYTDO's behalf made false and defamatory statements to third-parties, including Mr. Watson, with respect to Ms. Oehmigen's competence and/or integrity.   CNYTDO attributed such statements to Mr. Watson when, in fact, it was Mr. Curtis and other CNYTDO officials who falsely represented that Ms. Oehmigen was dishonest and had "serious performance issues."

## CNYTDO'S RECENT ACTIONS SHOW FURTHER DISCRIMINATORY AND RETALIATORY ANIMUS

76.    Upon information and belief, shortly before Ms. Oehmigen's termination, Mr. Curtis had promoted Mr. Kocik, a man, to the position of Center Director of the MEP Center. Mr. Kocik has since taken over Ms. Oehmigen's job duties.

77.    On April 12, 2017, the Board of CNYTDO voted to remove Ms. Oehmigen as a member.  Upon information and belief, the Board's deliberations took over two hours, and during the deliberations members of the Board raised concerns over whether Ms. Oehmigen's removal as an officer of CNYTDO was lawful.  The Board's vote to remove Ms. Oehmigen was ultimately made based on numerous false representations made by Mr. Curtis, Ms. Lee-Glauser and others.  One member of the Board, Steve Bregande, stated that Ms. Oehmigen was only given the position of President of the MEP Center "so her feelings weren't hurt."

17

78.     Upon information and belief, three (3) active female members of the Board resigned following Ms. Oehmigen's termination and removal.  Ms. Lee-Glauser is now the only active female member of the Board.

**FIRST CAUSE OF ACTION**
**UNLAWFUL RETALIATION UNDER FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3730(h)**
**(against CNYTDO)**

79.     Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

80.     Beginning in November 2015, Ms. Oehmigen engaged in protected activities under the False Claims Act when she researched and reported, in good faith, her concerns regarding certain deficiencies within CNYTDO's corporate governance documents.  Among other things, she reported to Mr. Curtis and Ms. Lee-Glauser that the geographic and substantive scope of CNYTDO's operations exceeded those authorized by CNYTDO's Certificate of Incorporation, that CNYTDO had not filed the requisite assumed name certificates to permit it to do business under the Institute's name outside a narrow geographic region, and that necessary updates to CNYTDO's governance documents and policies may not have been made to comply with the requirements of the New York Nonprofit Revitalization Act.

81.     Upon information and belief, the deficiencies that Ms. Oehmigen reported were material, in that they may have led to the submission of false information to NIST, an office of the U.S. Department of Commerce which provided grant funding to the MEP Center.

82.     Ms. Oehmigen also engaged in protected activity when she attempted to stop CNYTDO from using federally (NIST) funded resources intended for the MEP Center's activites for the operations of the Institute, a fee-for-service unit which was never awarded funding from the United States government.

18

83.     Ms. Oehmigen took such actions under an objectively reasonable and good faith belief that CNYTDO was committing fraud against the government.

84.     In response to Ms. Oehmigen's good faith reporting of these actions, CNYTDO intentionally retaliated against her by marginalizing her, threatening her, terminating her employment, and removing her from the CNYTDO Board of Directors.  Upon information and belief, it did so because it believed that she would report its activity to the federal government and would take other necessary steps to ensure compliance with the terms of federal grants.

85.     Such conduct by CNYTDO has damaged Ms. Oehmigen in a substantial amount, including but not limited to personal hardship, damage to her professional reputation, and economic loss, in an amount to be determined at trial.

86.     Ms. Oehmigen seeks damages and all other forms of relief available under 31 U.S.C. § 3730(h).

## SECOND CAUSE OF ACTION
## UNLAWFUL RETALIATION UNDER NEW YORK STATE FALSE CLAIMS ACT
## NY STATE FINANCE LAW § 191
### (against CNYTDO)

87.     Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

88.     Beginning in November 2015, Ms. Oehmigen engaged in protected conduct under the New York False Claims Act by reporting deficiencies within CNYTDO's corporate governance documents, which were submitted to NYSTAR, a state grant-making entity, in connection with the MEP Center's grant applications.

89.     Ms. Oehmigan also engaged in protected conduct when she attempted to stop CNYTDO from using state (NYSTAR) funds intended for the MEP Center for the operations of

the Institute, a fee-for-service unit which was never awarded funding from the State of New York.

90.     Ms. Oehmigen took such actions under an objectively reasonable and good faith belief that CNYTDO was committing fraud against the government of the State of New York.

91.     In response to Ms. Oehmigen's good faith reporting of these actions, CNYTDO intentionally retaliated against her by marginalizing her, threatening her, terminating her employment, and removing her from the CNYTDO Board of Directors.  Upon information and belief, it did so because it believed that she would report its activity to the State of New York and would take other necessary steps to ensure compliance with the terms of state grants.

92.     Such conduct by CNYTDO has damaged Ms. Oehmigen in a substantial amount, including but not limited to personal hardship, damage to her professional reputation, and economic loss, in an amount to be determined at trial.

93.     Ms. Oehmigen seeks damages and all other forms of relief available under State Finance Law § 191.

### THIRD CAUSE OF ACTION
### UNLAWFUL REMOVAL OF AN OFFICER
### NY NOT-FOR-PROFIT CORPORATION LAW § 714
### (against CNYTDO)

94.     Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

95.     Article V, Section 1 of CNYTDO's Bylaws state that the officers of the corporation include, "a Chairman of the Board, a Chief Executive Officer (CEO), [and] such number of Presidents as may be determined by the Board…."

96.     Ms. Oehmigen was appointed by the Executive Committee as President of the MEP Center in September 2014 and is therefore an officer of CNYTDO.

20

97.    As an individual vested with the "President" title, Ms. Oehmigen was given the authority of an officer of CNYTDO.  For example, Article V, Section 9 of the Bylaws provides as follows: "In the case of the absence of the CEO, or of his or her inability from any cause to act, one of the Presidents, in order of seniority, shall perform the duties of his or her office."

98.    Section 714 of the New York Not-For-Profit Corporation Law states that an officer elected by members of the board may only be removed by the board.

99.    In addition, Article V, Section 4 of the Bylaws provide for removal of an officer only "by vote of the Board of Directors."

100.    Ms. Oehmigen's removal as President and Center Director of the MEP Center was not brought before its Board, as required under § 714 and CNYTDO's Bylaws.

101.    Given that Ms. Oehmigen was an officer of CNYTDO, her purported removal from her position as President and Center Director of the MEP Center was neither valid nor authorized.

102.    Such conduct by Defendants has damaged Ms. Oehmigen in a substantial amount, including but not limited to personal hardship, damage to her professional reputation, and economic loss, in an amount to be determined at trial.

103.    Ms. Oehmigen seeks damages and all other forms of relief available under § 714.

### FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT
### (against CNYTDO)

104.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

105.    At the time Ms. Oehmigen was hired, and from time to time thereafter, she was provided with a Personnel Policies and Procedures Manual (the "Manual") which set forth the

guidelines, terms and conditions of her employment upon which she relied during the period of her employment with CNYTDO.

106.    The Manual contained a Whistleblower Policy (the "Policy").

107.    The Policy defined a "whistleblower" as "an employee of Central New York Technology Development Organization, Inc. (CNYTDO) who reports an activity that he/she considers to be illegal or dishonest, to the President of the organization."

108.    The Policy further states, in pertinent part, that "If an employee needs to report illegal and dishonest activities against the President they should contact the Chairman of Board of Directors…."

109.    Under the Policy, "Examples of illegal or dishonest activities are violations of federal, state or local laws; billing for services not performed or for goods not delivered; and other fraudulent financial reporting."

110.    The Policy also states that "The Organization will not retaliate against a whistleblower."  This provision is an express limitation on CNYTDO's right to discharge its employees at will.

111.    Ms. Oehmigen agreed to and did fully and faithfully perform services in accordance with the Manual.

112.    In reliance on the terms of the Policy, Ms. Oehmigen reported activities that she considered to be illegal or dishonest to both Mr. Curtis and the Chairman of the Board of CNYTDO.

113.    In response to Ms. Oehmigen's reporting of these actions in good faith, Defendants intentionally retaliated against her by marginalizing her, threatening her, terminating her employment, and removing her from the CNYTDO Board.

114.    In doing so, Defendants breached their agreement with Ms. Oehmigen by retaliating against her.

115.    Such conduct by Defendants has damaged Ms. Oehmigen in a substantial amount, including but not limited to personal hardship, damage to her professional reputation, and economic loss, in an amount to be determined at trial.

116.    Ms. Oehmigen seeks damages and all other forms of relief available under the law.

**FIFTH CAUSE OF ACTION**
**GENDER BASED DISCRIMINATION UNDER NEW YORK HUMAN RIGHTS LAW**
**NY EXECUTIVE LAW § 296**
**(against CNYTDO)**

117.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

118.    Ms. Oehmigen is a female and a member of a protected class under § 296.

119.    Section 296 prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment on the basis of gender.

120.    By the acts and conduct described herein, CNYTDO discriminated against Ms. Oehmigen in the terms, condition, and privileges of her employment in violation of § 296.

121.    As a result of CNYTDO's unlawful acts, Ms. Oehmigen has suffered and/or continues to suffer, lost wages, lost fair pay, disparate compensation, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

122.    Ms. Oehmigen seeks damages and all other forms of relief available under § 296.

**SIXTH CAUSE OF ACTION**
**AGE BASED DISCRIMINATION UNDER NEW YORK HUMAN RIGHTS LAW**
**NY EXECUTIVE LAW § 296**
**(against CNYTDO)**

123.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

124.    Ms. Oehmigen is over forty (40) years of age and is a member of a protected class under § 296.

125.    Section 296 prohibits an employer from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment on the basis of age.

126.    By the acts and conduct described herein, CNYTDO discriminated against Ms. Oehmigen in the terms, condition, and privileges of her employment in violation of § 296.

127.    As a result of CNYTDO's unlawful acts, Ms. Oehmigen has suffered and/or continues to suffer, lost wages, lost fair pay, disparate compensation, salary and other benefits, physical and psychological harm, emotional distress, and other damages.

128.    Ms. Oehmigen seeks damages and all other forms of relief available under § 296.

**SEVENTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(against Scott Curtis, Individually)**

129.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

130.    Ms. Oehmigen had a valid employment relationship with CNYTDO and diligently and faithfully performing her job duties until her termination.

131.    Upon information and belief, Mr. Curtis used wrongful means, including false and misleading statements about Ms. Oehmigen's performance and integrity, in order to convince the

CNYTDO Executive Committee to terminate Ms. Oehmigen. In making these misrepresentations, Mr. Curtis acted with malice.

132.    Mr. Curtis caused Ms. Oehmigen's termination because he wanted to prevent Ms. Oehmigen from revealing his misuse of MEP Center funds for the Institute and his efforts to defraud the federal and New York State governments.   In doing so, Mr. Curtis exceeded the bounds of his authority as an employee of CNYTDO and acted as a third-party to Ms. Oehmigen's employment relationship

133.    Such conduct by Mr. Curtis has damaged Ms. Oehmigen in a substantial amount, including but not limited to personal hardship, damage to her professional reputation, and economic loss, in an amount to be determined at trial.

134.    Ms. Oehmigen seeks damages and all other forms of relief available under the law.

## EIGHTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER NEW YORK HUMAN RIGHTS LAW
## NY EXECUTIVE LAW § 296
## (against Scott Curtis, Individually)

135.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

136.    Mr. Curtis directly participated in and thereby aided and abetted in the unlawful discrimination of CNYTDO against Ms. Oehmigen.

137.    Based upon the foregoing, Mr. Curtis discriminated against Ms. Oehmigen in the terms, conditions, and privileges of her employment in violation of § 296(6) by threatening her employment, marginalizing her and causing her termination.

138.    As a result of these unlawful acts, Ms. Oehmigen has suffered, and/or continues to suffer, lost wages, compensation, salary, other benefits, physical and psychological harm, emotional distress, and other damages.

139.    Ms. Oehmigen seeks damages and all other forms of relief available under § 296.

**NINTH CAUSE OF ACTION**
**DEFAMATION (SLANDER)**
**(against Scott Curtis, Individually)**

140.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

141.    Upon information and belief, Mr. Curtis made false statements to Mr. Watson, Director of NYSTAR, that Ms. Oehmigen was incompetent in her position as President of the MEP Center and that she was dishonest in her September 2016 presentation of the MEP Center's financial performance to the CNYTDO Board.

142.    The statements made by Mr. Curtis to Mr. Watson, a third party, are false.

143.    Mr. Curtis made these statements in a grossly irresponsible manner, with knowledge of their falsity.

144.    The false statements made by Mr. Curtis have injured Ms. Oehmigen in her profession and therefore constitute defamation per se.

145.    To the extent that Ms. Oehmigen is required to prove damages, Ms. Oehmigen has suffered, and/or continues to suffer, lost wages, compensation, salary, other benefits, physical and psychological harm, emotional distress, and other damages.

146.    Ms. Oehmigen seeks damages and all other forms of relief available under the law.

**TENTH CAUSE OF ACTION**
**DEFAMATION (LIBEL)**
**(against Scott Curtis, Individually)**

147.    Ms. Oehmigen incorporates by reference the paragraphs above as if fully set forth herein.

148.    Upon information and belief, following Ms. Oehmigen's termination, Mr. Curtis published several false statements, in writing, which were intended to impeach Ms. Oehmigen's professional reputation.

149.    These defamatory statements were published in a memorandum to members of the CNYTDO Board in or around April of 2017.

150.    The memorandum stated, among other things, that Ms. Oehmigen was terminated for performance related issues.  The memorandum also contained a statement that Ms. Oehmigen presented false or misleading information to the Board during her September 2016 presentation of the MEP Center's financial performance.

151.    The statements contained within the memorandum are false.

152.    These false statements were distributed to members of the CNYTDO Board, which included several colleagues and business contacts of Ms. Oehmigen.

153.    Mr. Curtis made these statements in a grossly irresponsible manner, with knowledge of their falsity.

154.    The false statements made by Mr. Curtis have injured Ms. Oehmigen in her profession and therefore constitute defamation per se.

155.    To the extent that Ms. Oehmigen is required to prove damages, Ms. Oehmigen has suffered, and/or continues to suffer, lost wages, compensation, salary, other benefits, physical and psychological harm, emotional distress, and other damages.

156.   Ms. Oehmigen seeks damages and all other forms of relief available under the law.

## CONCLUSION

Wherefore, Plaintiff respectfully requests that the Court grant the relief requested herein, attorney's fees and such other, further, and /or different relief as the Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: October 3, 2017                    BOUSQUET HOLSTEIN PLLC


                                          /s/  Kavitha Janardhan_____
                                          Kavitha Janardhan, Esq.
                                          Bar Roll No.  519962
                                          Attorneys for Plaintiff, Cindy Oehmigen
                                          110 West Fayette Street, Suite 1000
                                          Syracuse, New York 13202
                                          Telephone: (315) 422-1500

3090442_11

28